IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

MARK ALLEN WREN ,                  §
        TDCJ-CID NO.927238,        §
        Plaintiff,                 §
v.                                 §        CIVIL ACTION NO. H-09-0041
                                   §
NATHANIEL QUARTERMAN, *et al.*,    §
                                   §
        Defendants.                §

## MEMORANDUM AND ORDER ON DISMISSAL

Plaintiff Mark Allen Wren, an inmate incarcerated in the Texas
Department of Criminal Justice - Correctional Institutions Division
("TDCJ-CID") proceeding *pro se* and *in forma pauperis*, filed a
complaint and an amended complaint, alleging violations of the
Eighth Amendment. (Docket Entries No.1, No.5). Defendants Rodolfo
Diaz, James Jones, and Mary Leyva have filed a motion for summary
judgment[1] (Docket Entry No.27), to which plaintiff has filed a
response. (Docket Entry No.28). Plaintiff has also filed a motion
for summary judgment. (Docket Entry No.17). For the reasons to
follow, the Court will grant defendants' motion for summary
judgment, deny plaintiff's motion for summary judgment, and dismiss
the complaint with prejudice.

## I. BACKGROUND

Plaintiff is serving a fifteen year sentence for a 2000
robbery conviction from Ector County, Texas, and two other lesser

---

1 The Court did not order service of process on defendants TDCJ Director
Nathaniel Quarterman or State Unit Classification Chief John Doe; therefore,
these defendants have not made an appearance in this case.

and concurrent sentences for a 1997 robbery conviction and a 1986 burglary conviction. TDCJ Website.² Plaintiff claims in July 2007, he entered an agreement with a prison official to report activities related to an illicit drug and tobacco smuggling operation on the unit where he was incarcerated; plaintiff was assured that he would be placed in safekeeping or protective custody if his activities were discovered. (Docket Entry No.5). When a deal went bad, plaintiff filed a life endangerment form with officials on September 6, 2007. The Unit Classification Committee ("UCC") on that unit recommended to the State Classification Committee ("SCC") that plaintiff be transferred to another unit due to an enemy situation. (Id.). In November 2007, he was transferred to another TDCJ unit, where he was housed in the general population. (Id.). Within weeks, he was threatened by gang members; plaintiff reported the threat and again requested safekeeping. (Id.). The UCC investigated his claims and recommended that he be placed in safekeeping. (Id.). While in transit status, plaintiff reported to the UCC Chief that the threat from gang members was state-wide and that a transfer would not end the threat. (Id.). The State Classification Committee ("SCC"), however, transferred him to another unit in March 2008. (Id.). Plaintiff was again placed in the general population. (Id.).

Within a couple of months, plaintiff was identified by gang

---

2 http://168.51.178.33/webapp/TDCJ/InmateDetails.jsp?sidnumber=03567066

members.   (Id.).   Although plaintiff reported the threats, he
refused to submit another life endangerment form or to identify the
inmates who threatened him.   (Id.).   Plaintiff was given a
temporary housing change but later moved back to a cell with a
known gang member.  (Id.).  After complaining to officials, he was
moved to another building. On June 21, 2008, he was physically and
sexually assaulted by gang members.   (Id.).   He reported the
physical assault but not the sexual assault.  (Id.).  The UCC again
recommended that he be placed in safe-keeping P-2 custody and
transferred to another unit.  (Id.).  Plaintiff wrote numerous TDCJ
officials that the threat was state-wide and requested safe-keeping
status.  (Id.).  In late October 2008, plaintiff was transferred to
the Terrell Unit in lieu of safe-keeping.  (Id.).

     At the initial UCC hearing on the Terrell Unit, plaintiff
recounted his history and requested to be placed in safekeeping.
(Id.).  Plaintiff was placed in the general population.  On October
28, 2008, plaintiff wrote the Safe Prison Program Coordinator Sgt.
Rodolfo Diaz, requesting an interview.  (Id.).  Plaintiff claims
that he saw Sgt. Diaz a few days later during a shakedown; Diaz
showed plaintiff the letter that plaintiff had written and
indicated that he would call him out after the shakedown.  (Id.).
Diaz never called plaintiff.  (Id.).

     Within a couple of weeks, plaintiff observed two inmates
staring at him every day while he was in the chow line.  He wrote

                                    3

Diaz again but received no response. (Id.). On November 16, 2008, as he was preparing to shower, plaintiff was struck on the back of his head and kicked in the face by an unknown assailant or assailants. (Id.). He saw two inmates rushing into the main hallway from the shower area. (Id.). Plaintiff walked to the infirmary and security was called. (Id.).

Plaintiff filed another life endangerment form requesting safekeeping and protective custody. On November 19, 2008, the Terrell UCC recommended a transfer to another unit due to unknown enemies substantiated by plaintiff's injuries. (Id.). The SCC agreed and plaintiff was transferred to the Central Unit on December 31, 2008. (Docket Entry No.27-1, pages 4-5, 17-19).

Other than Nathaniel Quarterman and John Doe, plaintiff names as defendants only those persons who were on the Terrell Unit from late October 2008, until mid-November 2008.[3] He seeks an injunction ordering immediate placement in safekeeping for the remainder of his sentence and monetary damages for his physical injuries and mental stress and pain. (Docket Entry No.5). Plaintiff also moves for summary judgment on the ground that defendants failed to protect him from an inmate attack. (Docket Entry No.17).

---

3 Plaintiff states in his response to defendants' summary judgment motion that the time line relevant to this suit is from September 6, 2007, when he filed his first life endangerment claim to November 16, 2008, when he filed his first Step 1 Grievance about the November 16, 2008 assault. (Docket Entry No.28). Other than Nathaniel Quarterman and the unknown state classification chief, plaintiff names no other defendants who could possibly be parties to events on units other than the Terrell Unit.

4

Defendants move for summary judgment on grounds that plaintiff did not exhaust his administrative remedies through the grievance process as to his claims against defendants Warden James Jones and Unit Classification Chief Mary Leyva and they assert the defenses of qualified immunity and Eleventh Amendment immunity. (Docket Entry No.27).

## II. DISCUSSION

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). The moving party bears the burden of initially pointing out to the court the basis of the motion and identifying the portions of the record demonstrating the absence of a genuine issue for trial. Duckett v. City of Cedar Park, Tex., 950 F.2d 272, 276 (5th Cir. 1992). Thereafter, "the burden shifts to the nonmoving party to show with 'significant probative evidence' that there exists a genuine issue of material fact." Hamilton v. Seque Software, Inc., 232 F.3d 473, 477 (5th Cir. 2000) (quoting Conkling v. Turner, 18 F.3d 1285, 1295 (5th Cir. 1994)).

## A. EXHAUSTION

Plaintiff claims that upon his arrival at the Terrell Unit, he informed Warden Jones and UCC Chief Leyva about the safety issues at other units and requested to be placed in safekeeping. Plaintiff claims that Leyva made several comments like "the administration on those other units should have protected you" and "if you would learn to keep your mouth shut people wouldn't be after you."[4] (Docket Entry No.5, pages 7-8). He claims that Warden Jones said, "We'll put him in the laundry to work. . . . Boy, Tango is everywhere, be careful." (Id., page 8). Thereafter, plaintiff was placed in the general population. (Id.).

Plaintiff claims at the UCC hearing after his attack in the shower area, Leyva said, in response to his request for safekeeping, "It's your own fault, you probably went and told somebody you was [sic] a snitch. . . . Keep your mouth shut!" (Id., page 9). Plaintiff claims that Leyva and Jones knew of the threat to his safety but took minimal measures to ensure his safety; consequently, he suffered physical and mental injuries from the shower assault. (Docket Entry No.17, page 5).

Defendants contend that plaintiff did not exhaust his claims against defendants Jones and Leyva; therefore, such claims are barred by the exhaustion requirement of 42 U.S.C. § 1997e(a).

---

4 Plaintiff claims in his response that Leyva also said, "He beat Tango out of some tobacco and now wants our help. . . . That was your last unit's responsibility, not ours." (Docket Entry No.28, page 5).

6

(Docket Entry No.27).

Section 1997(e) of 42 United States Code, as amended by the Prison Litigation Reform Act, provides that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997(e); Booth v. Churner, 532 U.S. 731 (2001); Wright v. Hollingsworth, 260 F.3d 357, 358 (5th Cir. 2001). "[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." Porter v. Nussle, 534 U.S. 516, 532 (2002). Exhaustion is mandatory. Booth, 532 U.S. at 739. Consistent with Supreme Court precedent, the Fifth Circuit has also mandated that a prisoner must exhaust his administrative remedies by complying with applicable prison grievance procedures before filing a suit related to prison conditions. Johnson v. Johnson, 385 F.3d 503, 515 (5th Cir. 2004).

TDCJ-CID currently provides for a two-step grievance procedure for presenting administrative grievances. Powe v. Ennis, 177 F.3d 393, 394 (5th Cir. 1999). A prisoner's administrative remedies are deemed exhausted when a valid grievance has been filed and the state's time for responding thereto has expired. Id.

Defendants claim, without contravention, that plaintiff filed

his first Step 1 grievance after his assignment to the Terrell Unit on November 16, 2008. (Docket Entry No.27). The record shows that plaintiff filed Step 1 Grievance Number 2008049918 on November 16, 2008. (Docket Entry No.27-2, pages 5-6). He complained that the SCC had refused to follow the recommendations of the UCCs on three occasions but he made no mention of Jones, Leyva, or the Terrell Unit's UCC. (Id.). Investigator Jones responded on November 24, 2008, that an offender protection investigation had been completed, that plaintiff had been seen by the UCC on November 19, 2008, and the UCC recommended transfer to the SCC. (Id.). Plaintiff filed Step 2 Grievance 2008049918 on November 24, 2008. (Id., pages 3-4). Again, he raised no issues with respect to Leyva, Jones, or the Terrell Unit's UCC. (Id.). On December 17, 2008, Assistant Regional Director Guyton responded that plaintiff was on transient status and approved for a transfer. (Id.).

Plaintiff does not dispute that he has not exhausted his claims against Jones and Leyva through TDCJ's grievance process. (Docket Entry No.28). Accordingly, plaintiff's claims against defendants Jones and Leyva are subject to dismissal for failure to exhaust.

### B. ELEVENTH AMENDMENT IMMUNITY

Eleventh Amendment immunity bars a suit in federal court by a citizen of a state against his own state or against a state agency or department. Hughes v. Savell, 902 F.2d 376, 377-78 (5th Cir.

1990). Eleventh Amendment immunity has a jurisdictional effect; it deprives a federal court of jurisdiction to hear a suit against a state. Warnock v. Pecos County, Tex., 88 F.3d 341, 342 (5th Cir. 1996). This immunity extends to suits for monetary damages against state officials in their official capacity. Buckhannon Bd. and Care Home, Inc. v. West Virginia Dept. of Health and Human Resources, 532 U.S. 598, 609 n. 10 (2001) (holding "[o]nly States and state officers acting in their official capacity are immune from suits for damages in federal court"). Accordingly, plaintiff's claims for monetary damages against all defendants in their official capacity as employees of the State will be dismissed.

## C. QUALIFIED IMMUNITY

"Qualified immunity is 'an entitlement not to stand trial or face the other burdens of litigation.'" Saucier v. Katz, 533 U.S. 194, 199-200 (2001) (quoting Mitchell v. Forsyth, 472 U.S. 511, 526 (1985)). Qualified immunity "provides ample protection to all but the plainly incompetent or those who knowingly violate the law." Malley v. Briggs, 475 U.S. 335, 341 (1986).

"To rebut the qualified immunity defense, the plaintiff must show: (1) that he has alleged a violation of a clearly established constitutional right, and (2) that the defendant's conduct was objectively unreasonable in light of clearly established law at the time of the incident." Waltman v. Payne, 535 F.3d 342, 346 (5th

Cir. 2008) (footnote omitted). The Court has discretion "in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." Pearson v. Callahan, – U.S. –, 129 S.Ct. 808, 818 (2009).

Prison officials have a duty to protect inmates from harm or violence by other inmates. Farmer v. Brennan, 511 U.S. 825, 833 (1994). Not every injury suffered by an inmate at the hands of another rises to the level of a constitutional violation. Id. at 834. To establish a failure-to-protect claim under 42 U.S.C. § 1983, a prisoner must show that he has been incarcerated under conditions posing a substantial risk of serious harm and that prison officials were deliberately indifferent to his need for protection. Id.; Neals v. Norwood, 59 F.3d 530, 532 (5th Cir. 1995).

To act with deliberate indifference, a prison official "must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." Farmer, 511 U.S. at 837. A prisoner alleging an Eighth Amendment violation need not show that prison officials believed that harm would actually occur-"it is enough that the official acted or failed to act despite his knowledge of a substantial risk of serious harm." Id. at 842. A prison official's knowledge of the risk "can be proven through circumstantial evidence, such as by showing that the risk was so

10

obvious that the official must have known about it." <u>Johnson v.
Johnson</u>, 385 F.3d 503, 524 (5th Cir. 2004).   Only deliberate
indifference will suffice to state a failure-to-protect claim; mere
negligence is not sufficient. *See* <u>id.</u>; *see also* <u>Oliver v. Collins</u>,
914 F.2d 56, 60 (5th Cir. 1990) (holding that negligence is not a
basis for a claim under 42 U.S.C. § 1983).

Plaintiff contends that he sent a letter to defendant Rodolfo
Diaz, the Terrell Unit's Safe Prisons Coordinator, after he was
assigned to the general population at the Terrell Unit.   (Docket
Entry No.5).   Plaintiff claims that on October 30 or 31st, Diaz
addressed him during a shake-down and asked if he recognized the
letter that plaintiff had written to him.   (<u>Id.</u>, page 8).
Plaintiff said yes and told Diaz that he needed to talk with him on
an urgent matter.   (<u>Id.</u>).   Diaz indicated that he would call
plaintiff after the shakedown but he never did.   (<u>Id.</u>).   Plaintiff
claims that weeks later before the assault, he wrote another letter
to Diaz requesting a personal interview.   (<u>Id.</u>).   Diaz did not
respond to the letter.   (<u>Id.</u>).   Plaintiff complained in Step 1 and
2 Grievance Number 2008049918 that he had twice attempted to speak
to Sgt. Diaz about the threats before he was assaulted but he "was
ignored and have yet spoken to him."   (Docket Entry No.27-2, page
3).

Sgt. Diaz acknowledges his role as Safe Prison Coordinator on
the Terrell Unit but attests, without contravention, that gang
activity is minimal on the Unit for the following reasons:

11

> [M]ost of the inmates assigned to the Terrell Unit are there for medical reasons, age, or disassociation/renouncement of gang membership, [therefore,] problems with gang activity are not common. In addition, all inmates assigned to the Terrell Unit are minimum-custody inmates, and therefore, they do not have significant disciplinary histories. The Terrell Unit does not house medium or close-custody inmates. It also does not house Administrative-Segregation inmates or inmates placed in safekeeping status.

(Docket Entry No.27-5, page 2). Diaz also attests that he does not have the authority to assign an inmate to safekeeping status and cannot authorize housing changes or unit transfers. (Id., page 3). Diaz further attests that he did not know plaintiff or anything about him before his assignment to the Terrell Unit and was unaware of a risk of serious harm to his safety before his assault allegations on November 16, 2008. (Id., page 3).

Unlike plaintiff's claim that Diaz acknowledged receipt of the first letter, plaintiff states no facts to support his claim that Diaz received and ignored his second letter, in which plaintiff expressed his concern about the two inmates outside the chow hall. Plaintiff concedes that Diaz did not interview him while plaintiff was on the Terrell Unit and that they did not discuss plaintiff's security issues or his concerns that the inmates watching him in the chow hall were gang members plotting an assault.

The record, viewed in the light most favorable to plaintiff, shows that Diaz arguably could have been aware of plaintiff's security issues on other units and his request for an initial interview. The record, however, does not show that Diaz was aware

of the two inmates outside the chow hall or other facts by which he could have inferred that plaintiff faced a substantial risk of serious harm from a gang member on the Terrell Unit, given the low incidence of gang activity on the Unit and the custody level of inmates incarcerated there. Likewise, the record does not show that Diaz actually inferred from plaintiff's past history or his requests for an interview that plaintiff faced a substantial risk of harm to his safety on the Terrell Unit. Accordingly, plaintiff fails to show that Sgt. Diaz was deliberately indifferent to his safety needs in violation of the Eighth Amendment and fails to overcome Sgt. Diaz's defense of qualified immunity on his Eighth Amendment failure-to-protect claim. Defendants, therefore, are entitled to summary judgment.

### D. PERSONAL INVOLVEMENT

"Personal involvement is an essential element of a civil rights cause of action." Thompson v. Steele, 709 F.2d 381 (5th Cir. 1983). Each defendant must either actively participate in the acts complained of or implement unconstitutional policies that result in injury. Mouille v. City of Live Oak, Texas, 977 F.2d 924, 929 (5th Cir. 1992).

Plaintiff has also named as defendants former Director Nathaniel Quarterman and Chief of State Classification John Doe. (Docket Entry No.5). Plaintiff states no facts to show that Director Nathaniel Quarterman was personally involved in any

13

incident of which plaintiff complains in the present suit or that he implemented an unconstitutional policy, *i.e.*, the Safe Prison Plan, with respect to plaintiff's status or safekeeping. Accordingly, plaintiff's claims against Nathaniel Quarterman are subject to dismissal as legally frivolous pursuant to 28 U.S.C. § 1915(e)(2)(B).

Likewise, neither plaintiff's pleadings nor the record reflect that John Doe, the Chief of the SCC, was personally involved in making decisions regarding plaintiff's custody classification, that his actions alone denied plaintiff the classification that plaintiff sought, or that he implemented an unconstitutional policy, *i.e.*, the Safe Prisons Plan, with respect to plaintiff's safekeeping status. According to Warden Jones's affidavit, the SCC is the sole authority as to the placement of inmates in safekeeping status and inter-unit transfers. (Docket Entry No.27-6, page 3). Jones attests that the SCC is comprised of two voting committee members and that their decisions must be unanimous. (Id.). If an unanimous decision cannot be reached, a third committee member will vote. (Id.). Jones attests that "[t]he SCC has the authority to override UCC decisions in the interest of the safety, security, and orderly management of inmates and TDCJ institutions." (Id.).

In this case, the Terrell UCC recommended that plaintiff be transferred to another unit and the SCC adopted such recommendation after reviewing the Unit's offender protection investigation

14

reports. (Docket Entry No.27-3, page 18). With respect to earlier SCC decisions, plaintiff states no facts to show that John Doe or any other SCC member acted with deliberate indifference to his safety needs by ordering a transfer instead of placing plaintiff in protective custody. Accordingly, plaintiff fails to state a cognizable Eighth Amendment claim against John Doe, the Chief of the SCC.

### III. CONCLUSION

Based on the foregoing, the Court ORDERS the following:

1.  Plaintiff's motion for summary judgment (Docket Entry No.17) is DENIED.

2.  Defendants' motion for summary judgment (Docket Entry No.27) is GRANTED. All claims against all defendants are DENIED and this civil action is DISMISSED WITH PREJUDICE.

3.  All other motions, if any, are DENIED.

The Clerk will provide copies to the parties.

SIGNED at Houston, Texas, on _____, 2010.

EWING WERLEIN, JR.
UNITED STATES DISTRICT JUDGE

15